The People of the State of Illinois, Defendant in Error, v. William A. Bither and Henry W. Kaup, Plaintiffs in Error.

## Gen. No. 28,346.

1. CRIMINAL PROCEDURE—*necessity for bill of exceptions allowed during term to preserve error in preliminary rulings.* Motions to quash the indictment and for severance and a challenge to the array, together with the supporting affidavits and oral evidence, will be expunged from the record on appeal where no bill of exceptions to preserve them was asked for or allowed during the term and they are preserved only in the bill of exceptions allowed after judgment was entered at a subsequent term.

2. CRIMINAL PROCEDURE—*rulings on preliminary matters deemed proper on review in absence of bill of exceptions.* On error from a judgment of conviction in a prosecution, the trial court will be deemed to have properly overruled motions to quash the indictment and for a severance and a challenge to the array, where nothing appears in the record in support thereof except in a portion of the bill of exceptions expunged from the record.

3. CRIMINAL PROCEDURE—*challenge to array not part of trial reviewable under bill of exceptions allowed after term.* A challenge to the array is no part of the trial of the cause within the purview of an order made at a subsequent term after entry of judgment, allowing a bill of exceptions, and the ruling thereon is not preserved for review on error from the judgment by reason of such bill of exceptions.

4. CRIMINAL PROCEDURE—*subsequent declarations of conspirator not admissible against co-conspirator.* It was error to admit in evidence, over objection, alleged declarations by one of two persons

charged with conspiracy, made after the consummation of the alleged conspiracy and in the absence of his codefendant, tending to implicate the latter in the alleged conspiracy, where the declarations were mere narratives as to what had been done and had no tendency to accomplish the purpose of the conspiracy.

5. Criminal procedure—*argument as to guilt of conspirator based on incompetent declarations of co-conspirator prejudicial.* In a prosecution of codefendants for conspiracy, it was prejudicial error to permit the State's Attorney to argue to the jury the guilt of one of the defendants, as based upon incompetent declarations made by his codefendant by way of narrative after the consummation of the alleged conspiracy, tending to show that he had paid his codefendant part of the fruits of the conspiracy, where there was no other evidence from which the guilt of the codefendant could be inferred, especially where the court had admitted the incompetent evidence over such codefendant's objection, and refused to limit its effect to the declarant.

6. Schools and education—*ownership of school funds and property in City of Chicago and not board of education.* School property and funds in the City of Chicago are owned by the city and not by the board of education under the provisions of Cahill's Ill. St. ch. 122, ¶ 156 *et seq.*, relative to condemnation of property for school purposes, etc., notwithstanding the amendments of 1917, enlarging the powers of the school board and making it independent of the city council in some respects, such amendments leaving the title to school lands and the control and disposition of school funds unchanged.

7. Conspiracy—*variance as to ownership of property obtained by conspiracy fatal.* There is a fatal variance between an indictment charging defendants with conspiracy to obtain money from the Chicago board of education and the proof, where the evidence shows that the money obtained as the result of the alleged conspiracy was fraudulently obtained by defendants from the rental and sale of buildings on lands condemned by the city for school purposes, the city and not the board of education being the owner of the lands, under Cahill's Ill. St. ch. 122, ¶ 156 *et seq.*

8. Conspiracy—*variance as to property obtained by criminal conspiracy fatal.* There is a fatal variance between an indictment charging defendants with having obtained school moneys by conspiracy and the evidence which shows that the conspiracy was to procure title to buildings and improvements on lands condemned by the city for school purposes, that the lands were condemned exclusive of improvements, title to which the defendants fraudulently procured in themselves and which they thereupon used for their personal profit.

Error by defendants to the Criminal Court of Cook county; the

Hon. JACOB H. HOPKINS, Judge, presiding.   Heard in the second division of this court for the first district at the March term, 1923. Reversed and remanded.   Opinion filed January 22, 1924.   Rehearing denied February 8, 1924.

LE FORGEE, SCHROEDER & TATE, for plaintiffs in error; CLARENCE S. DARROW, of counsel.

ROBERT E. CROWE, State's Attorney, and EDWARD E. WILSON, Assistant State's Attorney, for defendant in error.

MR. JUSTICE BARNES delivered the opinion of the court.

Plaintiffs in error were convicted of the crime of conspiracy.   The indictment was returned in May, 1922, and contained four counts.   The first charges a conspiracy to obtain from the board of education of the City of Chicago, a body politic and corporate, a large amount of money, goods and personal property, to wit, the sum of $21,500, by means and use of the confidence game; the second, a conspiracy to obtain said money by false pretenses; the third, a conspiracy to embezzle said money and convert the same to their own use without the consent of said board of education, and the fourth, a conspiracy to steal, take and carry away said sum of money.   After a general verdict of guilty the usual motions for a new trial and arrest of judgment were in turn made and overruled, and judgment was entered upon the verdict.

The first part of appellants' argument is devoted to alleged errors in the court's action in overruling at the November term, 1922, a motion by each defendant to quash the indictment, a motion by Bither for a severance and a challenge to the array.   These motions and the challenge, together with affidavits and oral testimony purporting to have been offered in support thereof, are made to appear in the bill of exceptions filed under an order allowing the same, entered

at the judgment term in January, 1923. It does not appear that any time for filing a bill of exceptions, to preserve these preliminary proceedings and documents on which they were based, was asked for or allowed at said November term. The clerk's record shows that the motions to quash were overruled November 23, 1922; that the motion for a severance and the challenge to the array were overruled on the 28th of said month, and that the parties proceeded the next day to select a jury, which was completed and accepted December 8; that the verdict was rendered December 21; that the motion for a new trial was then made and continued to the January term, when on the 23rd of that month the judgment was entered and sixty days' time given within which to file a bill of exceptions in the cause, and that the bill was filed February 23.

Because these proceedings preliminary to the trial were heard and disposed of at the November term, and no bill of exceptions was asked for or allowed at that term, the State's Attorney has moved that the portions of the bill of exceptions showing such proceedings, and said motions, and the affidavits and oral evidence on which they were based, be expunged from the record. That motion was reserved to the hearing and under well-established rulings must be granted. (*People v. Strauch,* 247 Ill. 220, 225; *Finch & Co. v. Zenith Furnace Co.,* 245 Ill. 586; *Village of Franklin Park v. Franklin,* 228 Ill. 591; *People v. May,* 276 Ill. 332.) As no other reasons than those contained in the expunged part of the record are advanced in support of said motions and challenge, or appear on the face of the record, we must hold that they were properly overruled. (*People v. Munday,* 293 Ill. 191.)

While it is true, as stated by counsel for plaintiffs in error, that it was held in *Marsh v. People,* 226 Ill. 464, that a motion to quash on the ground of the illegal selection of the grand jury should have been sus-

tained, yet it was not questioned there, as here, that the affidavits upon which the motion was based were a proper part of the record. Presumably they were or the court would not have considered them.

Counsel also contend that the challenge to the array was a part of the trial of the cause and came within the purview of the order of January 23, allowing the bill of exceptions. We do not so regard it. Not until the jury was sworn were the defendants put in jeopardy. All proceedings prior thereto were preliminary to the trial. Adverse rulings in such proceedings must be preserved by a bill of exceptions "taken at the term at which the rulings were made, unless the court at that term extends the time within which the bill may be signed and sealed." (*People v. Strauch,* 247 Ill. 220, 225.) Without discussing the authorities cited in the *Strauch* case, we think the rule recognized therein is that all preliminary proceedings pertaining to matters not arising during the course of the trial of the issues submitted can be preserved for review only by a bill of exceptions filed pursuant to an order therefor made at the term at which such preliminary proceedings are had or within the time duly extended. While we are not disposed to regard the challenge to the array well founded, yet in view of this holding we shall not discuss the ground on which it is based.

The other alleged errors relate to proceedings had in the course of the trial which require a statement of the facts as disclosed by the evidence.

Pursuant to a request of the board of education of the City of Chicago, condemnation proceedings were had to acquire land for play grounds for the Forest-ville avenue school and the Wendell Phillips school in said city. These proceedings were begun and conducted to final judgment in the name of the "City of Chicago, in trust for the use of the schools," as required by statute. (Section 132, ch. 122, Rev. St., Cahill's Ill. St. ch. 122, ¶ 156.) Pursuant to these proceedings and in compliance with said statute the

title to such lands became vested in the city in trust for such purpose. (Id.) At that time plaintiff in error Bither was the attorney for said board, and conducted the proceedings. While they were pending he negotiated with the various owners of the lands sought to be acquired, and closed an agreement with each which specified that the owner agreed to sell his property at a specified sum, less liens, etc., as full compensation for the taking thereof in such condemnation proceedings, and consented to a verdict and judgment for such amount, and agreed ''to deed the same to the City of Chicago, in trust for the use of schools, by warranty deed, and to furnish a merchantable abstract of title,'' which he later did. Following the quoted words, which were in print, was the clause, in the handwriting of Bither, ''building to remain property of owner.''

The verdicts of the jury were for the prices of such lots or tracts, respectively, as thus agreed upon, ''exclusive of the improvements thereon,'' and the petition of each owner for the order of payment designated such price as for the property condemned ''exclusive of the improvements.'' No reference, however, to the improvements or their exclusion was made in the judgment orders or the orders for payment or the deeds from the owners to the city.

Concurrently with the execution of each agreement the owner, at the request of Bither, who in most instances explained in substance that it would expedite the board's disposition of the buildings, signed a paper conveying all his right, title and interest in and to the building and improvements on the property, the instrument reciting that he intended to convey all rights retained by him in said building ''through the condemnation proceedings.''

Each of these instruments was left with Bither and came into the hands of plaintiff in error Kaup, whose name was inserted therein in Bither's handwriting as transferee or assignee, and by virtue of these instru-

ments Kaup took possession of some ninety buildings covering properties condemned, from which he collected some $20,000 in rentals, and a further sum from the sale of a few of said buildings.

The owners in many instances testified that Kaup's name was not in the conveyance when they signed it. In some instances it was. None of them knew him or had any dealings with him personally or received any money from him or anybody else for the improvements so transferred. The only money they received was the amount allowed in the condemnation judgment, and that sum was paid out of the school fund by the county treasurer on order of court.

Testimony was received over objection that Kaup had said that he paid $20,500 for said improvements, and over objection the State's Attorney was permitted to argue to the jury as an inference therefrom, when taken in connection with the other facts of the case, that he had paid it to Bither. Later the court refused instructions to the effect that such evidence should be limited to Kaup. Errors are assigned to the overruling of these objections, and to the refusal of such instructions.

It appears that Kaup was called before the State's Attorney and questioned with regard to these transactions. In response to inquiries he then stated that he had paid $20,500 for said buildings. His statements were made in the presence of a detective and stenographer who testified to the same. One Zeiger, who collected rents from said buildings for Kaup, also testified that Kaup had told him that he paid for the bills of sale respectively a sum appearing in figures on a corner of the instrument. While these statements were properly received as admissions against Kaup, they were not admissible as to Bither. They were mere narratives as to what had been done. They were not made in Bither's presence and were not acts done or declarations made in furtherance of the conspiracy.

(*Spies v. People,* 122 Ill. 1; *Samples v. People,* 121 Ill. 547, 551; *People v. Halpin,* 276 Ill. 363, 374.) The State's Attorney urges that these declarations were made during the pendency of the conspiracy, but even if they were they had no tendency to accomplish its purpose. As said in the *Samples* case, *supra,* "the declaration, to be admissible, must not only be made during the pendency of the criminal enterprise, but also in furtherance of its objects. A mere narrative to a stranger, related during the pendency of the criminal enterprise, but of a past event or occurrence, is just as objectionable as if related after the criminal enterprise has terminated." In this as in that case, counsel for the People fail to observe this distinction. Stating the law more fully in the *Spies* case, the court said (p. 237):

"It is undoubtedly the law, that, after a conspiracy is established, only those declarations of each member, which are in furtherance of the common design, can be introduced in evidence against the other members. Declarations, that are merely narrative as to what has been done or will be done, are incompetent and should not be admitted except as against the defendant making them, or in whose presence they are made."

It was argued by the State's Attorney as a deduction from such incompetent evidence, over objection of Bither's counsel, that Bither received the $20,500 which Kaup so declared he had paid for the buildings. There was no other evidence from which such an inference could be drawn, and with the indorsement of the court's rulings the argument probably went far to fix Bither's guilt in the minds of the jury. Based, as it was, entirely upon incompetent evidence, it could not have been otherwise than prejudicial.

Citing *People v. Burger,* 259 Ill. 284, and *People v. Strosnider,* 264 Ill. 434, 452, the State's Attorney argues that regardless of such evidence, Bither's guilt was established beyond a reasonable doubt, and therefore the incompetent evidence and argument thereon

do not constitute reversible error. On the other hand, it is argued as strenuously by counsel for Bither that it cannot be said that Bither's guilt of a conspiracy to cheat and defraud the board of education was established beyond a reasonable doubt when it appears the board was undeceived, it having been informed by an official report from Bither that the land was condemned ''exclusive of the improvements,'' and having recognized Kaup's right to possession of the buildings by accepting from him nearly $10,000 for ground rental.

As it becomes necessary to reverse on other grounds we need not discuss the relative weight of the evidence in support of these conflicting conclusions. Suffice it to say we cannot but think that the use of such incompetent, prejudicial evidence had a potent influence in bringing about Bither's conviction. It is not a case where it can be said, using the language of the *Burger* case, ''that such testimony could not have reasonably affected the result.'' As said in that case: ''In determining whether or not the admission of incompetent testimony constitutes reversible error each case stands alone and must be determined upon the facts presented by its record.'' On the facts in this record we cannot doubt that the refusal of the court to restrict such evidence to Kaup, and permitting the State's Attorney to argue to the jury as a deduction therefrom that Bither got $20,500 that should have gone into the school fund, were so prejudicial as to constitute reversible error.

Plaintiffs in error also urge that if the evidence disclosed a conspiracy there was a fatal variance both as to the property sought to be obtained or embezzled and as to the ownership thereof. The contention is that if the evidence shows a conspiracy, it was one to acquire the buildings, and they were the property of the city and not of the board of education. The argument is based on the statute and decisions construing it, particularly provisions in sections 132, 133, 135,

ch. 122, Rev. St. (Cahill's Ill. St. ch. 122, ¶¶ 156, 157, 159), which provide that condemnation proceedings to acquire real estate for school purposes shall be conducted in the name of the city, in trust for the use of the schools (sec. 132); that the title to the same shall be held in such name, and all conveyances of real estate shall be made to the city in trust for the use of schools (Id.); that no sale of such real estate shall be made except by the city council upon the written request of the school board (sec. 133); and that all money received from any source for school purposes shall be held by the city treasurer, *ex officio,* as school treasurer, in separate funds for school purposes, subject to warrants of the board of education which must be countersigned by the mayor and city comptroller (sec. 135).

Construing these provisions, which have undergone no substantial change in later revisions of the statute, so far as the title and ownership of school lands and school funds and the relation of the city and the board of education with respect to them are concerned, it was said in *People v. Roche,* 124 Ill. 9, 13:

"It seems clear, from all the legislation on the subject, it was the intention of the legislature the city, in cities having over one hundred thousand inhabitants, should have the title to all real estate held for school purposes, and the city treasurer should have the custody of all school funds, no matter from what source derived. The board of education in such cities is given no independent powers as to the real estate held or to be purchased for school purposes. Whatever the board can do in reference to buying or leasing sites for schoolhouses, or issuing bonds for the erection of buildings thereon, can only be done 'with the concurrence of the city council.' The powers and duties the board may exercise, independently of the city council, relate mostly to furnishing schoolhouses, the employing of teachers, and the management of schools generally. But all school property and funds are

placed in and under the care of the city council or some city officer. There is no pretense there is any express provision of law that authorizes the board of education to take to itself the conveyance of any real estate, for the purpose of holding the title *as an actual owner might do.*"

Considering various provisions of the school laws as bearing upon the relation of the board of education to the municipal government of Chicago, the court, in *Brenan v. People,* 176 Ill. 620, said (p. 630) : "It seems clear to us that the board of education of the City of Chicago is still connected with, dependent upon, and to some extent a part of, the municipal government of that city." It also said that the amendments of the school laws up to that time did not authorize the conclusion that the board was no longer a municipal agency (p. 627), and in reaching its conclusion laid much stress on the facts that the statutes vested the title to school lands in the city (p. 629) and placed the school funds in the custody of the city treasurer, and that they could not be paid out upon the board's warrants unless signed by the mayor and city clerk (p. 630). Later, in discussing the authority of the city treasurer with respect to school funds in *People v. Flynn,* 265 Ill. 414, the court said (p. 427) : "While it is true that the school fund is a special fund raised for a special purpose, it is nevertheless *a part of the city's funds* and received and held by the treasurer by virtue of his office as such city treasurer."

But it is urged in substance by the State's Attorney that the amendments of 1917 so changed the school laws as to render these decisions no longer in point. It is true they give the board of education enlarged powers, but they are mostly of an administrative character. As amended the act also declares the board to be a body politic and corporate, capable of suing and being sued, but its capacity in that respect was recognized by the Supreme Court before that amendment (*City of Chicago v. City of Chicago,* 207 Ill. 37),

and the change declaring the city treasurer to be *ex officio* treasurer of said board does not affect the portions of the act whereby the city still exercises a certain control of the school funds. Nor does the change which no longer requires concurrence with the city council in the exercise of certain administrative powers of the board affect the questions of title and legal ownership. None of these amendments, in our opinion, has any tendency to change the grounds of the Supreme Court's holding that the board is a part of the municipal government. The principal provisions of the statute upon which that conclusion was reached remain unchanged. The title to the school lands is still vested in the city, and they cannot be sold except by the city council (sec. 133 of the School Act), and the warrants upon funds in the hands of the treasurer must still be countersigned by the mayor, and now by the city comptroller instead of the city clerk (sec. 135), and the school treasurer is required to keep such fund in such place or places of deposit as may be ordered by the city council (Id.). The statute, therefore, still evinces the policy not to give the board of education absolute control over or title to either school lands or school funds, and it is still true, as said in the *Brenan* case of previous legislation (p. 628): "If the effect of the school legislation is to confer corporate powers on the board of education or to make it a State agency for certain purposes, still the change has not been such as to disconnect it from the city government." Taxes for school purposes are still levied by the city council and paid into the hands of the city treasurer, from which they cannot be taken for the schools without the the signature of other city officials than members of the board. While it may be said that school moneys "belong" to the school board in the limited sense that they are raised for school purposes, which it is the function of the school board to carry out, yet in the legal sense, as

said in the *Flynn* case, they are "a part of the city's funds."

Nor does the decision in *City of Chicago v. City of Chicago*, 207 Ill. 37, cited by the State's Attorney, indicate a different view of the court on the question of ownership of school lands. The question there involved was whether certain school lands were subject to special assessment. While the board was appropriately made a party because it would initiate the process of paying the assessment from school funds, yet against its own contention that the property was that of the People of the State of Illinois, the court expressly said the title was in the City of Chicago, in trust for the use of schools in that city.

We think, therefore, that the indictment having alleged that the object of the conspiracy was to obtain money, the ownership should have been laid in the City of Chicago and not in the board of education, and in that respect there was a fatal variance. The character of the conspiracy charged is that of one to cheat and defraud. In such a case the Supreme Court has held that the rule is the same as that established under an indictment for larceny, namely, that a variance between the proof and the allegations as to ownership is fatal. (*Lowell v. People*, 229 Ill. 227, 237.) The State's Attorney also urges that the school board being the beneficiary of the school funds, it is proper to allege its ownership of them, citing the rule which in indictments for larceny authorizes alleging ownership in a bailee from whose possession the property was taken. We are not aware of any such extension of the rule. The rental and moneys from the sale of the buildings which went into the hands of Kaup were never actually or constructively in possession of the board or any of its authorized agents or anyone who held the relation of a bailee thereto. It is difficult to see how there could be a conspiracy to obtain money from one who never had title to or possession of it.

The conspiracy which the evidence tended to establish was one, not to obtain money, but to procure title to and possession of the buildings, through the plan of separating them from the land and acquiring title to them directly from the owners by the bills of sale, and to the land by condemnation proceedings. All the documents pertaining thereto, including the verdict in the condemnation proceedings, disclosed such purpose. Pursuant to that plan Kaup obtained title to the buildings, took possession of them and collected rent from them. True, the owners were paid nothing additional for the buildings, and undoubtedly understood that the compensation agreed upon with Bither covered the buildings, nevertheless they voluntarily parted with their title to them, and even though it was fraudulently acquired so far as the city or school board was concerned, yet the object of the conspiracy which the evidence tended to establish was effectually consummated when by such methods the buildings were thus separated from the land and taken possession of. We think, therefore, that the evidence tended to show that the direct object of the conspiracy was to obtain said buildings and not money, even though it contemplated profit from the sale or use of the buildings. That fact did not make the money obtained thereby the money of the city or the board, even if in equity Bither, as a trusted agent for the board, could be required to account for the same, or the legal title to the buildings might on grounds of fraud have been defeated. A criminal prosecution is a legal and not an equitable proceeding. The fact that the city might have increased the school fund from the buildings had it obtained them did not make the money made out of them by Kaup under a legal title, though fraudulently acquired, money of the city or board. The money thus obtained, therefore, was not in the eye of the law the money of either the city or the board. In *Goodhue v. People,* 94 Ill. 37, the court held that the

embezzlement of county orders was not the embezzlement of money, and illustrating the rule said (p. 49):

"If a man steal a horse and sell him to a stranger, he may be convicted of stealing the horse but not of stealing the money received as the price of the stolen horse."

In *Weimer v. People,* 186 Ill. 503, it was held that the defendant could not be convicted of embezzling money on proof that he had received from the town collector town orders as such, even if he had embezzled the orders. It was held in *People v. Warfield,* 261 Ill. 293, that a conspiracy to obtain a contract, or order or promissory notes was not a conspiracy to obtain money. In *Lory v. People,* 229 Ill. 268, it was held that the charge of obtaining money by the confidence game was not sustained by proof of obtaining a check, and that the variance was fatal.

The conviction cannot stand, and the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

GRIDLEY, P. J., concurs.

MR. JUSTICE FITCH specially concurring: I concur in the conclusion that the judgment must be reversed and the case remanded because of the error in admitting the declarations of Kaup; but I do not assent to that part of the opinion holding that the alleged variances are fatal.